**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| **BRADLEY JAY BECK, JR.; BRADLEY JAY BECK, SR.; and NIKKI LYNN BECK,**<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>**RYAN SMITH,** in his individual and official capacities; and the marital community or domestic partnership comprised of **RYAN SMITH** and **DOE SMITH; DOUGLAS LAWSON,** in his individual and official capacities; and the marital community or domestic partnership comprised of **DOUGLAS LAWSON** and **DOE LAWSON; SPOKANE COUNTY**, a Washington municipal corporation**,**<br><br>　　　　　Defendants. | Case No.: 2:15-CV-00213<br><br>**COMPLAINT** |

Plaintiffs **BRADLEY JAY BECK, JR., BRADLEY JAY BECK, SR.,** and **NIKKI LYNN BECK,** through attorney of record **ADAM P. KARP** of **ANIMAL LAW OFFICES,** allege:

**I. JURISDICTION AND VENUE**

　　1.　This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367; and venue is properly set in the United States District Court for the Eastern District of Washington pursuant to 28 U.S.C. § 1391.

**COMPLAINT** - 1

2. The causes of action arise from factual allegations occurring in this judicial district.

3. Plaintiffs are informed and believe, and on that basis allege, that each of the named Defendants is situated in this judicial district.

4. Plaintiff **BRADLEY JAY BECK, JR.** ("Bradley, Jr.") resided in Spokane County, State of Washington, during the time of the events described herein.

5. Plaintiff **BRADLEY JAY BECK, SR.** ("Bradley, Sr.") resided in Spokane County, State of Washington, during the time of the events described herein.

6. Plaintiff **NIKKI LYNN BECK** ("Nikki") resided in Spokane County, State of Washington, during the time of the events described herein.

7. Bradley, Sr. and Nikki are and were, at all relevant times, a married couple.

8. Now-deceased, eight-year-old neutered male mixed breed dog, named **CASH,** was regarded by the Plaintiffs as their sentient personalty and immediate family member.

9. **SPOKANE COUNTY** ("County") is a local government entity and municipal corporation, organized under the laws of the State of Washington, including for purposes of liability under 42 U.S.C. § 1983. It operates the

**COMPLAINT** - 2

**SPOKANE COUNTY SHERIFF'S OFFICE** ("SCSO"), the entity for which **SMITH** and **LAWSON** worked during the incident complained of.

10.     Defendant **RYAN SMITH** ("Smith") is, and at all germane times was, a resident of Spokane County, and employee and/or agent of County acting within the scope of his employment for purposes of state law, and under color of state law for purposes of federal law. He is being sued in his personal and official capacities. The marital or domestic partnership community of **RYAN SMITH** and **DOE SMITH** has also been sued on the basis that the acts of Smith enriched the marital or domestic partner community. Should such community not exist, Smith is sued individually.

11.     Defendant **DOUGLAS LAWSON** ("Lawson") is, and at all germane times was, a resident of Spokane County, and employee and/or agent of County acting within the scope of his employment for purposes of state law, and under color of state law for purposes of federal law. He is being sued in his personal and official capacities. The marital or domestic partnership community of **DOUGLAS LAWSON** and **DOE LAWSON** has also been sued on the basis that the acts of Lawson enriched the marital or domestic partner community. Should such community not exist, Lawson is sued individually.

12.     Plaintiffs' claims for attorney's fees and costs are authorized by, *inter alia*, 42 U.S.C. § 1988. No administrative claim filing or other pre-litigation

**COMPLAINT** - 3

requirements apply to their claims against Smith, Lawson, and the County under 42 U.S.C. § 1983.

13. On or about May 13, 2015, the County was duly served with a *Notice of Claim* on behalf of each of the Plaintiffs in full compliance with state and county claim-notice laws. More than sixty days have elapsed since the Plaintiffs filed their claims with the County.

14. This court has personal jurisdiction over the Defendants.

## II. GENERAL ALLEGATIONS

15. On August 27, 2014, the Plaintiffs owned Cash.

16. On August 27, 2014, Bradley, Sr. and Nikki owned 20215 E. Sprague Ave., Greenacres, Wash. 99016, the location of the incident described herein.

17. On August 27, 2014, at about 3:50 p.m., Jeff Alderman delivered Bradley, Jr.'s straw cowboy hat and keys to Smith at the Valley Precinct of the SCSO.

18. Smith called the Plaintiffs' home phone number but never left a voicemail, although the number was set up to receive and save messages.

19. While other valid phone numbers were known to the County and, upon investigation, discoverable by Smith, Smith never contacted Bradley, Sr.'s cell phone number.

20. Though Bradley, Jr. had made contact with SCSO to recover his

**COMPLAINT** - 4

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

missing keys earlier in the day on August 27, 2014, there was no exigency, yet Smith determined to drive to Bradley, Jr.'s residence to deliver the hat and keys.

21. Smith arrived at the Becks' residence at about 4:51 p.m.

22. On arrival, Smith observed that the Becks' premises were completely fenced and secured by a closed gate spanning the entire driveway with three, prominent "Beware of Dog" signs. One sign was affixed to the gate itself. The other two flanked it.

23. While still on the street side of the gate, Smith noticed that Cash and at least one other dog were barking loudly at him.

24. Smith honked the air horn of his patrol car to get the attention of any residents at the Becks' premises. No person responded.

25. Notwithstanding the foregoing fence, gate, and signage warning him off the premises; that nobody was home; that more than one dog was barking loudly at him; and that the gate was powered by a motorized arm creating forcible resistance to his breaking and entering the Becks' property, Smith muscled through the barrier and walked down the driveway.

26. As he trespassed, he extended his ASP baton in his right hand in anticipation that one of the dogs might not take kindly to his unauthorized presence, and come after him.

27. Before he killed Cash, as described more fully below, Smith walked

COMPLAINT - 5

past a total of four "Beware of Dog" signs and near a fifth sign warning him about the presence of Cash and other dogs.

28.   Smith alleges in his report that when he pushed through the gate, he believed that Cash and the other dog were restrained by an invisible electronic fence. However, Cash was not wearing an invisible fence-type shock collar when he was shot and killed by Smith.

29.   As Smith came within feet of the Becks' house, Smith alleges in his report that Cash approached, at which time he swung his ASP baton with his right hand and backed away.

30.   After swinging at Cash, Smith alleges in his report that Cash bit his thigh, whereupon, due to his poor balance, he fell. Cash did not knock him to the ground.

31.   Smith alleges in his report that Cash then bit his left bicep. Instead of using the baton and striking Cash with it, Smith dropped the baton, grabbed his gun, and fired it three times at Cash. The time was about 4:54 p.m.

32.   Smith failed to deploy his oleocapsicum spray against Cash. It was, on information and belief, of military grade and stronger than that used by United States Postal Service letter carriers with virtually a 100 percent chance of success warding off and neutralizing canine threats.

33.   Though certified to use a TASER, Smith failed to equip this less-

**COMPLAINT** - 6

lethal weapon, and, thus, failed to deploy it against Cash, even though the SCSO Manual, Policy 309.5.6, effective on the date of the incident, explicitly anticipated its use against an animal, specifically a dog.

34. On the date of the incident, the County regarded the TASER it issued to Smith as a less-than-deadly use of force.

35. On the date of the incident, the County regarded the firearm it issued to Smith as a deadly use of force.

36. The SCSO Manual, Policy 312.6, effective on the date of the incident, advised Smith that where he had "sufficient advance notice that a potentially dangerous animal may be encountered, deputies should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, TASER device, oleocapsicum (OC) spray, animal control officer)."

37. Though he anticipated a potentially violent conflict with Cash before he ever entered the Becks' premises, Smith never contacted animal control prior to entering the Becks' premises. In so doing, given the foregoing circumstances, Smith violated SCSO Manual, Policy 419, effective on the date of the incident, which provides that, "Due to the hazards of handling animals without proper equipment, responding deputies generally should not attempt to capture and pick up any animal, but should keep the animal under observation until the arrival of the SCRAPS officer." No examples as to when a deputy may act alone (i.e., without

**COMPLAINT** - 7

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

the animal control officer), as discussed in SCSO Manual, Policy 419.2, effective on the date of the incident, applied.

38. SCRAPS officers were available on August 27, 2014 at or about the time Smith entered the Becks' premises without permission.

39. Shortly after killing Cash, Smith spoke to neighbor Sharon Duncan, who notified Bradley, Sr. of the shooting.

40. Bradley, Sr. arrived at his residence and parked behind Smith's patrol vehicle.

41. Smith then called radio dispatch indicating he shot a dog and requesting backup.

42. Liberty Lake Police Officers Taj Wilkerson and Ray Bourgeois arrived, as did several other SCSO deputies.

43. Bourgeois arrived at about 5:07 p.m. on August 27, 2014.

44. Bradley, Sr. stated that he wanted to find Cash and check on him. Bourgeois accompanied Bradley, Sr., where he found Cash still alive.

45. Bourgeois then informed Wilkerson, who claims to have called Spokane Valley Animal Hospital ("SVAH"). Computer-aided dispatch places his call at about 5:29 p.m. A woman named Amanda, who worked at SVAH, allegedly told Wilkerson to take Cash to Animal Emergency in Spokane or Post Falls.

46. Bradley, Sr. asked Wilkerson if he could take Cash to the emergency

COMPLAINT - 8

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

veterinary hospital. Wilkerson, in turn, asked Lawson.

47. Lawson denied Bradley, Sr.'s request, telling Wilkerson that he did not want Cash moved until SCRAPS arrived on scene. Lawson claims to have been concerned about rabies and, in a contemptibly ignorant frame of mind, asserted that by allowing Cash to obtain veterinary treatment, he would "lose the opportunity to do what was necessary with the dog to check for rabies."

48. Cash was up-to-date on his rabies vaccination on August 27, 2014.

49. When SCRAPS Officer Boyce did arrive, long after Smith shot him, she was forced to stage off the Becks' premises and not enter until further permission was given by the County. On information and belief, Lawson was the officer in charge to give such permission.

50. Cash died as Boyce and Bradley, Sr. attempted to move his body from the house, the location into which Cash fled through a dog door after being shot, to a vehicle for transport to a veterinary hospital.

51. Smith and Lawson, and each of them, proximately caused Cash's death.

52. At about 7:10 p.m. that evening, SCSO Detective Justin Elliott interviewed Bradley, Jr. and Bradley, Sr. Bradley, Sr. repeatedly stated that he wanted to talk to an attorney and attempted to leave the scene with his son. Elliott then ordered them to stay. Furthermore, SCSO Lieutenant John Nowels threatened

**COMPLAINT** - 9

Bradley, Sr. by giving him a warning.

53. Due to the tremendous stress of the shooting and sequelae, Bradley, Sr. developed sharp chest pains and shortness of breath. Medics were dispatched.

54. Bradley, Sr. declined their treatment at the time, instead focusing on remaining with his son, Bradley, Jr., Cash, and the anticipated arrival of media (due to his distrust of law enforcement and fear they would alter the scene).

55. After SCSO completed the shooting investigation at the Becks' premises, Bradley, Sr. went to Valley Hospital for an emergency assessment, radiographs, and a blood draw. Bradley, Sr. complained of dizziness, vomiting, high blood pressure, and chest pain. He was discharged at about 5 a.m. on August 28, 2014.

56. On September 11, 2014, Dr. Alisha Massa of the Washington Animal Disease Diagnostic Laboratory ("WADDL") of the Washington State University College of Veterinary Medicine, performed a gross necropsy of Cash, confirming that he died from ballistic trauma having been shot three times—once completely through the abdomen and thorax, once completely through the left thigh, and once through the abdomen and into the right thoracic wall with no exit wound as the bullet lodged against his ribs.

57. Each of the Becks lost the intrinsic value of Cash, as based on his unique qualities, characteristics, behaviors, personality, training, and bond, as well

**COMPLAINT** - 10

as the loss of his utility, companionship, love, affection, protection, and solace. In addition to being a close family member, Cash was Bradley, Jr.'s best friend, Nikki's guardian, and Bradley, Sr.'s excelling, working farm dog, who protected against coyotes, skunks, and other predators, and helped herd cattle.

58. At the time of his death, Cash had no fair market value and could not be replaced or reproduced. Any reasonable person in the Becks' position would not willingly have sold Cash at the time just prior to Cash's death. At that moment, and thereafter, Cash had an immense intrinsic value to each of the Becks.

59. Cash and each of the Becks formed a strong relationship, causing Cash to fundamentally change under their care. Cash was a close family companion and had special value, aiding each of the Becks in their enjoyment of life, well-being, growth, development, work and/or daily activities.

60. Each of the Becks experienced severe emotional distress from the acts and omissions identified herein.

### III. CLAIMS FOR RELIEF

71. The County is liable to the Becks based on the following legal claims and doctrines, stated in the alternative under FRCP 8(d)(2), and based on vicarious liability for pendent state claims (e.g., *respondeat superior* [imputing fault to County based on acts and omissions of Smith, Lawson, and other County employees]).

**COMPLAINT** - 11

72. All allegations above are incorporated by reference and reasserted as to the claims below.

### FEDERAL CLAIMS

73. **FIRST CLAIM (Smith)** – Violation of Federal Constitutional Guarantees (42 U.S.C. § 1983), as to Smith, whose actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by him. Smith unlawfully and unconstitutionally entered the Becks' premises, whereupon he unlawfully and unconstitutionally seized the Becks' personalty, to wit, Cash, by shooting same, in violation of the Fourth Amendment to the United States Constitution.

74. **SECOND CLAIM (Lawson)** – Violation of Federal Constitutional Guarantees (42 U.S.C. § 1983), as to Lawson, whose actions were taken under color of law, violating clearly established rights, of which a reasonable person would have been aware at the time those actions of omission and commission were taken by him. Lawson unlawfully and unconstitutionally seized the Becks' personalty, to wit, Cash, by preventing Cash from receiving emergent and life-saving veterinary care, in violation of the Fourth Amendment to the United States Constitution.

### PENDENT STATE CLAIMS (SMITH)

**COMPLAINT** - 12

75. **THIRD CLAIM** – Trespass to Land

76. **FOURTH CLAIM** – Conversion and/or Trespass to Chattels

77. **FIFTH CLAIM** – Gross Negligence, Willful Misconduct, and/or Reckless Property Damage/Destruction

78. **SIXTH CLAIM –** Reckless Infliction of Emotional Distress

79. **SEVENTH CLAIM** – Statutory and/or Common Law Nuisance (Private and/or Public; *Per Se* and/or non-*Per Se*)

80. **EIGHTH CLAIM** – Common Law and/or Statutory Negligence

### PENDENT STATE CLAIMS (LAWSON)

81. **NINTH CLAIM** – Conversion and/or Trespass to Chattels

82. **TENTH CLAIM** – Gross Negligence, Willful Misconduct, and/or Reckless Property Damage/Destruction

83. **ELEVENTH CLAIM –** Intentional and/or Reckless Infliction of Emotional Distress

84. **TWELFTH CLAIM** – Common Law and/or Statutory Negligence

85. The Becks reserve the right to amend the *Complaint* to raise additional, alternative claims for relief as discovery commences.

### PRAYER

WHEREFORE, the Becks pray for judgment against Defendants as follows:

A. For economic damages, representing the intrinsic value of Cash to each

COMPLAINT - 13

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

of the Becks, subject to proof and modification at trial;

B.     For special and general damages relating to loss of Cash's utility to each of the Becks;

C.     For noneconomic damages, including emotional distress, loss of enjoyment of life, and interference with quiet use and enjoyment of personalty, to each of the Becks, subject to proof and modification at trial;

D.     For pain and suffering endured by Bradley, Sr.;

E.     For medical bills incurred by Bradley, Sr.;

F.     For damages related to the constitutional violations asserted herein;

G.     For veterinary expenses pertaining to Cash's post-mortem assessment, and disposition;

H.     For prejudgment interest on liquidated sums;

I.     For punitive damages against Smith and Lawson under federal law;

J.     For reasonable attorney's fees and other litigation-related costs as allowed by law under 42 U.S.C. § 1988, or, in the alternative, statutory attorney's fees;

K.     For costs of suit;

L.     For postjudgment interest at the highest rate permitted by law;

M.     For such other and further relief as the Court may deem just and proper.

N.     NOTE: Monetary damages are sought herein by each of the Defendants in a sum far greater the statutory amount set to trigger the fee-shifting statute RCW

**COMPLAINT** - 14

Animal Law Offices of
Adam P. Karp, Esq.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com

4.84.250 *et seq.*, as amended.

Dated this August 18, 2015.

ANIMAL LAW OFFICES

_____
Adam P. Karp, WSBA No. 28622
*Attorney for Plaintiffs Beck*
114 W. Magnolia St., Ste. 425
Bellingham, WA  98225
(888) 430-0001
adam@animal-lawyer.com

**COMPLAINT** - 15

ANIMAL LAW OFFICES OF
ADAM P. KARP, ESQ.
114 W. Magnolia St., Ste. 425 • Bellingham, WA 98225
(888) 430-0001 • Facsimile: (866) 652-3832
adam@animal-lawyer.com